## Case No. 16,170.

### UNITED STATES v. ROBBINS.

[11 Int. Rev. Rec. 157.]

District Court, S. D. Ohio. May, 1870.

ATTORNEYS — COURTESY IN ARGUMENT — ATTACKS ON WITNESSES—VIOLATION OF INTERNAL REVENUE LAWS.

[1. It is disrespectful alike to jury and court for counsel to assume that utterly untrue imputations, wholesale abuse of witnesses unconnected with any criticism of their testimony, and attacks upon absent persons unknown to the trial, can by any possibility aid the cause of the defendant.]

[2. The court comments upon the difficulties attending trials for violation of the internal revenue laws, and the demoralizing effects flowing from the evasions of law by reputable business firms and their employés.]

[This was an indictment against John J. Robbins, for violation of the internal revenue laws for the purpose of evading payment of taxes.]

The court first recapitulated the testimony that had been given in reference to the charge of selling tobacco without proper stamps to Sprague, Warner & Co., of Chicago; to Randall, of Grand Rapids; and to Beidelbeck & Miller, of Davenport. As to the sales to Robert Sprague, James F. Rothschilds, and the White Brothers, the court considered the testimony so direct and simple that they would take no pains to recapitulate it.

First, as to the charge of selling to Sprague, Warner & Co. The testimony for the government showed that this firm ordered five cases of tobacco, containing five caddies, each branded "Admiration," from the defendant, and that in the usual course of trade, and in response to their order, they received the tobacco of that description. Subsequently, they received a letter from the defendant, which has been placed in evidence, asking pay for the tobacco. What the jury had to decide was whether it was reasonable to believe from the dray tickets, the bill of sale made out by defendant's clerk, the way-bills, the receiving books, and the testimony of Sprague, Warner & Co., that the defendant did send these goods in compliance with that order. If they thought the defendant did sell these goods, and that the proper stamps were not affixed, it would be their duty to find the defendant guilty on the third count.

Next, as to the tobacco, two cases of plug-tobacco pieces, sold to Randall at Grand Rapids. The testimony seemed to show that up-

on application from Sprague, Warner & Co., the defendant, by his agent, Charles J. Robbins, caused the bill of sale to be made out in the fictitious name of E. B. Ward, dated it at Danville instead of Cincinnati, and sent it accompanying the tobacco to Sprague, Warner & Co., of Chicago; that defendant subsequently wrote a letter claimed by the government to refer to these goods. in reference to the price to be paid for them; that they were subsequently sold to Randall, and found with counterfeit stamps attached in his possession by the government. If the jury found that the goods were traced from the defendant to Sprague, Warner & Co., from them to Randall, and then to the authorities in Cincinnati, and that they were sold by the defendant without the proper stamps affixed, they would find him guilty under the first count.

In relation to the Davenport transaction and the shipment of two cases of tobacco with counterfeit stamps to Beidelbeck & Miller, the court said: "One caddy of this lot had a very different treatment. Its history is most extraordinary, and important in this case. On the 5th of August, by order of the commissioner of internal revenue at Washington, this caddy was sent by the United States Express Company to General Young, supervisor of internal revenue, at Cincinnati. It arrived here on August 10. In the meantime. the defendant had learned of the seizure, and had instructed his agent, Saunders, to go to Davenport and secure if possible the destruction of the counterfeit stamps. After Saunders had started and before he reached the depot, the defendant learned that his factory had also been seized here; and he therefore detained Saunders a few days for consultation. The defendant shortly afterward learned from Collector Weitzel, in some mode, that the caddy had been ordered from Davenport to Cincinnati. And I wish that Collector Weitzel, and all other collectors who have business to do for the government of the United States, would understand that it is not their duty to make communications of any kind; no matter how severely they may be criticised, no matter how much they may lose the reputation of being clever fellows, they should not communicate in any way with persons charged with crime against the government. If they have not stability enough to be silent when approached by interested parties, they should resign their positions, and give place to others more competent to take care of the interests of the government. The details of this case show the effect of such communication." The court completed the history of the successful attempt to change the stamp on this caddy and the unsuccessful efforts of Robbins's agent to obtain possession of the balance of the caddies at Davenport, and instructed the jury, in case they found the defendant had sold the tobacco to Beidelbeck & Miller, to return a verdict of guilty on the fifth count.

In reference to the sale to White Brothers, the defendant having admitted the fact that the goods, with second-hand stamps attached, were sold as charged, it would be the duty of the jury to return a verdict of guilty on the sixth count.

Wm. Bateman, U. S. Dist. Atty., and B. Storer, Jr., Asst. U. S. Dist. Atty., assisted by counsellors, for the United States.

Hollister & Butterworth, for defendant.

EMMONS, Circuit Judge, concluded his charge to the jury as follows: In ordinary cases I should have submitted this cause to you without other comments. But after some consultation, I conclude to say a word or two about some of the incidents of this trial. The character of the discussions degenerated in a few instances into gross accusations and the imputation of bad motives on the part of the officers of the government, such as I suppose, as a general rule, ought not to be tolerated in any case. The uniform courtesy during the trial of the learned counsel for the defendant, made me reluctant to interrupt what, although in my own estimation distasteful and sometimes very extravagant, I thought without a violation of duty I might suffer to proceed. What was said, too, was so interwoven with an apparent good nature and pleasantry, that, as each excess occurred, they came and went before I felt it a duty to interfere. But I desire most emphatically to announce that it must not be cited as a precedent for what in future trials, as a judge, I shall deem it right to suffer. It degrades a public trial. Neither jury, counsel, nor court feel that self-respect, nor can they maintain that condition of mind, necessary for the performance of their duties, if, by the compulsions of the law or the tolerations of the bench, they are forced to listen, in circumstances which assume it is a legitimate part of a public trial, to an angry contest where the decorum and the proprieties of our homes, or an ordinary business intercourse, are utterly wanting. It is disrespectful alike to jury and court for counsel on either side to assume that utterly unproved imputations, that wholesale abuse of witnesses sworn, unconnected with any criticism of their testimony, and attacks upon absent persons who are unknown to the trial, can by any possibility aid a defendant, be he guilty or innocent. It supposes the court so constituted in both its branches as to be incapable of distinguishing between what alone it is sworn to consider on the one hand. and the passionate denunciations of counsel on the other. Although sufficiently intimated already, I take pains to repeat that, although I deem the argument of the learned counsel for the defendant a clear violation of the rule I intend to enforce, still it is not so far from precedent in this and other courts as to authorize any severity of rebuke; on the contrary, the general courtesy of the counsel during the trial so won upon the court, that it had much to do with what it suffered during the argument. There is, however, one por-

tion of it I wish particularly to notice. Counsel in his zeal expressed the belief that in the universal activity of the government assistants to oppress his client, they had actually poisoned the mind of the court, and quite clearly intimated that it was too prejudiced to sit in the trial of the cause. This, I suppose, I ought not to have permitted, and hope I may never again have cause to consider what, in such a contingency, a judge, mindful of the usefulness and power of the court, ought to do. I have concluded, however, instead of rebuking it directly here, to answer it in a mode I am certain will be more effective with the counsel and his client, and as influential as any other to teach new practitioners how in error they are when, in their zeal, they mistake an inflexible administration of the law for partiality and prejudice. To what I say, gentlemen, I ask your attention, as it has a practical application to your duties. You have before you as witnesses, men who are accomplices of the guilty participators in the offence for which the defendant is tried. This goes substantially to their credibility, and, so far as your verdict must rest upon their testimony, is worthy your consideration. Thinking it not impossible that, among the various prosecutions for offences under this law, I might be called upon to enforce its penalties; perceiving that each offence, no matter how many, even twenty in the same indictment, compelled me to inflict a prescribed punishment for each, I felt oppressed by the consequences which might, in certain instances, result. I, therefore, conferred with other able and experienced judges for some mode of mitigating the punishment. I called special attention to the peculiar condition of opinion in regard to offences against the government; that, for some unappreciable reason, although they were in fact among the most injurious and widely corrupting crimes, the fact was still beyond dispute that otherwise reputable men, those who would not steal their neighbor's goods or forge their names, would defraud the government by false invoices, smuggling, and false stamps. I brought forward the extraordinary facts of this case as they are claimed to exist by the government, the procuration of the counterfeit stamps, the employment of so many young men who had been taught to violate the law, and so take the first steps in crime, and found that while I could not look upon the defendant as an abandoned criminal, the public would demand in such a case what I might, in view of these circumstances, think should not be inflicted. I wished it even possible to omit the imposition of a punishment like that due to the hardened criminal who, abandoning all ordinary business, lives a continuous life of lawlessness and crime. It was thought we discovered a mode which in some degree would authorize the court, without a violation of duty, to temper the administration of this same statute to the exigencies of particular cases. I assure this counsel that it was be-

cause I entertained feelings wholly at war with, nay, on the other extreme, of those he so erroneously imputed, that I so anxiously sought an interpretation of the law which would authorize a kindly and mild judgment, should an exigency occur in which I should be called on to pronounce it. And although I may have ever so full convictions in this case, either way, resulting from a careful following of the proof, from the fact that I cannot leave behind my intelligence when I ascend the bench, and the necessity of accepting here as elsewhere conclusions which are necessary and inevitable, it is simply unenlightened to impute this necessary consequence to prejudice or hostility, any more than the same conditions should be imputed because, in view of the same facts, you, gentlemen, in the end pronounce the defendant guilty. So far forth as the judge can concede, without transparent affectation, he should do so, but while the jury are informed fully that the facts are for them, I have but little fear of doing injustice by a frank, unprejudiced rehearsal of them as they are proved, whether they defeat or sustain the prosecution or the defence. This I shall always deem it my duty to do. Whether a mild administration of this law can arrest the wrong is uncertain. I may, by and by, quite change my opinions in this regard. That it must in some way be arrested, is most certain. Its injurious consequences will not only damage every department of business in which they are perpetrated, and cruelly disappoint the just expectations of the upright and fair dealer, but by their effects in familiarizing with crime, work conseqences the most fatal in society. Every father who has a son must feel the danger of such influential and high-positioned tempters to crime. We may save, by good example and high teaching, our boys from the low haunts of vice and crime, but we are compelled to trust them to the leading and more important walks of business life. If they who control these stoop to the cowardly crimes of forgery and counterfeiting, and a degraded and discreditable public insists upon their decency and partial respectability, there is no safety anywhere for inexperience. The first lessons of dishonor and crime will be learned in the first teachings of the storehouse and the counting-room. Look over the vast ramifications of our revenue. See how it pervades all departments of trade, and reflect how innumerable are the occasions and how demoralizing must be the effects if leading, wealthy, influential citizens teach the whole body of their employees that perjury and fraud is justifiable, so long as its object is to avoid a public tax. And when I doubtfully suggest that this anomalous condition of public opinion may in the outset somewhat temper the severity of judgment, I must not be understood as insinuating that I do not most thoroughly believe that the commission of these crimes by prosperous men of wealth and position, with all the corrupting incidents which so generally attend them, are

infinitely more injurious and pervading in their consequences than the comparatively trivial evil of a secret midnight burglary, committed by a few degraded, obscure, and uninfluential thieves. And as in this case I have, so in all others I probably shall, yield to an anxiety that there shall be no escape, if, in fact, a defendant has committed a crime which, in its example and influence for evil, is exceeded by no officer of which this or any other tribunal has cognizance.

The jury found defendant guilty on the first, third, fourth, fifth, and sixth counts.